**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| CHRISTOPHER O'NEILL, | ) 3:12-cv-00030-LRH-WGC |
| | ) |
| Plaintiff, | ) **REPORT & RECOMMENDATION** |
| | ) **OF U.S. MAGISTRATE JUDGE** |
| vs. | ) |
| | ) |
| DR. ROBERT BANNISTER, et. al. | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

This Report and Recommendation is made to the Honorable Larry R. Hicks, Senior United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4. Before the court is Defendants' Motion for Summary Judgment. (Doc. # 89, Exhibits D-I at Doc. # 89-1 at 11-40, sealed Exhibits A, B, B1-7, C at Doc. # 91).)[1] Plaintiff has opposed the motion. (Doc. # 96.) Defendants filed a reply. (Doc. # 97.)

After a thorough review, the court recommends that Defendants' motion be granted.

**I. BACKGROUND**

At all relevant times Plaintiff Christopher O'Neill was an inmate in custody of the Nevada Department of Corrections (NDOC). (Pl.'s Compl. (Doc. # 4) at 1.) The events giving

---

[1] Refers to court's docket number.

1

rise to this litigation took place while Plaintiff was housed at Ely State Prison (ESP). (*Id.*) Plaintiff, a pro se litigant, brings this action pursuant to 42 U.S.C. § 1983. (*Id.*) Defendants are Dr. Robert Bannister, Dr. Karen Gedney, Dr. Michael Koehn, John Peery, and Sandra Snider.[2] (Screening Order (Doc. # 3).)

On screening, the court determined Plaintiff states colorable claims against Defendants in Counts I through III under the Eighth Amendment for deliberate indifference to a serious medical need related to the treatment of his hepatitis C. (Doc. # 3.)

Specifically, Plaintiff alleges that Defendants have known he has hepatitis C for eighteen years. (Doc. # 4 at 3.) In Count I, Plaintiff alleges that on January 20, 2011, Dr. Gedney answered Plaintiff's request asking about a treatment plan for his condition by stating, "there is no rush to consider treatment." (Doc. # 4 at 4.) Plaintiff claims he informed Dr. Gedney that he was experiencing pain and fatigue as a result of his condition, but she refused to provide him treatment. (*Id.*)

In Count II, Plaintiff alleges that on February 10, 2011, he filed a grievance regarding his hepatitis C and the lack of treatment for his painful symptoms. (Doc. # 4 at 5.) He asserts that defendant Snider responded to the grievance by telling Plaintiff that his liver enzymes were within normal limits and denied any medical care. (*Id.*) He contends that his lab results in fact showed his liver enzymes were elevated; therefore, defendant Snider was not truthful in her response. (*Id.*) Plaintiff then received a first level grievance response from defendant Peery, whom he asserts also denied treatment. (*Id.*) Finally, Plaintiff received a second level grievance response from Dr. Bannister, agreeing with the responses to the informal and first level

---

[2]  Mistakenly named by Plaintiff as Susan Snider.

grievances. (*Id.*) He contends their responses were deliberately indifferent to his serious medical need.

In Count III, Plaintiff alleges that on November 22, 2011, he was seen by Dr. Koehn regarding his elevated liver enzymes and extreme pain. (Doc. # 4 at 6.) Dr. Koehn performed an examination and confirmed Plaintiff's liver was swollen as a result of hepatitis C and that was causing his pain. (*Id.*) However, Dr. Koehn told Plaintiff that he does not treat hepatitis C and Plaintiff would just have to "tough it out." (*Id.*) Plaintiff alleges that Dr. Koehn ended the exam without providing treatment for his condition. (*Id.*)

Plaintiff previously moved for a preliminary injunction related to treatment for his condition. (Doc. # 10.) Specifically, he sought an order that Defendants have him evaluated by a liver specialist and that a liver biopsy be performed. (*Id.*) Plaintiff's motion was denied on the basis that Plaintiff had not demonstrated a likelihood of success on the merits, likelihood of irreparable injury in the absence of the issuance of an injunction, that injunctive relief was in the public interest or that the balance of hardships weighed in his favor. (Doc. # 34 (Report & Recommendation for denial of Pl.'s request); Doc. # 64 (Order adopting Report & Recommendation)). Plaintiff appealed this decision to the Ninth Circuit. (Doc. # 65.) The Ninth Circuit affirmed the court's decision denying Plaintiff's request for injunctive relief. (Doc. # 99.)

Defendants now move for summary judgment, arguing: (1) there is no evidence of deliberate indifference; instead, Defendants have provided Plaintiff with appropriate care and have continued to monitor his condition; (2) Plaintiff's official capacity damages claims against Defendants must be dismissed; and (3) Defendants are entitled to qualified immunity. (Doc. # 89.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff has opposed the motion, arguing that he did not receive adequate care or treatment for his condition from Dr. Gedney, Nurse Snider, Nurse Peery, Dr. Bannister or Dr. Koehn.

## II. LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). All reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed.R.Civ.P. 56(c)).[1] Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250. The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Although the parties may submit evidence in an inadmissible form, only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment. Fed.R.Civ.P. 56(c).

In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that

---

[1] Federal Rule of Civil Procedure 56 was amended in 2010 to state: "The court shall grant summary judgment if the movant shows that there is no genuine *dispute* as to any material fact and the movant is entitled to judgment as a matter of law." (Emphasis added.) The analysis under the cases cited, however, remains the same.

evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.* at 248.

In determining summary judgment, a court applies a burden shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'[ ] In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323-25. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties'

differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id.* Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id.* at 249-50, 255 (citations omitted).

## III. DISCUSSION

**A. Eighth Amendment Deliberate Indifference to Serious Medical Need**

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "The requirement of deliberate indifference is less stringent in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals because '[t]he State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992), *rev'd on other grounds, WMX Tech., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997). "In deciding whether there has been deliberate indifference to an

inmate's serious medical needs, [the court] need not defer to the judgment of prison doctors or administrators." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).

A finding of deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's responses to that need." *McGuckin*, 974 F.2d at 1059; *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104); *see also Akhtar*, 698 F.3d at 1213. Examples of conditions that are "serious" in nature include "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60; *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (quoting *McGuckin* and finding that inmate whose jaw was broken and mouth was wired shut for several months demonstrated a serious medical need).

If the medical need is serious, the plaintiff must show that the defendant acted with deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (quoting *Jett*, 439 F.3d at 1096). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id.* Inadvertence, by itself, is insufficient to establish a cause of action under § 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts which the inference could be

7

drawn that a substantial risk of serious harm exists, and he must also draw the inference."
*Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (quoting *Jett*, 439 F.3d at 1096) (This second prong...is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference.").

"Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment" or the express orders of a prisoner's prior physician for reasons unrelated to the medical needs of the prisoner. *Hunt*, 865 F.2d 198, 201 (9th Cir. 1989) (internal quotation marks and citation omitted). In addition, it "may be shown by the way in which prison officials provide medical care." *Crowley v. Bannister*, --- F.3d ---, 2013 WL 5813178, at * 9 (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006), *overruled on other grounds by WMX Techs, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc)) (internal quotation marks omitted). Where delay in receiving medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury. *McGuckin*, 974 F.2d at 1060.

"A difference of opinion between a physician and the prisoner-or between medical professionals-concerning what medical care is appropriate does not amount to deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)). Instead, to establish deliberate indifference in the context of a difference of opinion, the inmate "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and that the course of treatment was chosen "in conscious disregard of an excessive risk to [the prisoner's] health." *Id*. at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

///

**B. Analysis**

Defendants do not dispute that Plaintiff's hepatitis C constitutes a serious medical need. (*See* Doc. # 97 at 2:13-14.) Therefore, the court need only address whether they are entitled to summary judgment on Plaintiff's claim that their conduct amounts to deliberate indifference.

**1. Dr. Gedney**

Plaintiff claims Dr. Gedney was deliberately indifferent when she responded to a medical kite dated January 18, 2011. In the kite, Plaintiff asked the following:

> What is the treatment plan for my Hepatitis C? You have been aware of the infection in me for over 18 years yet so far no treatment. I suffer from side effects including joint pain and fatigue. Should you inoculate me for Hep. A & B? I would like to know my treatment plan.

(*See* Doc. # 91-2 at 43.)

On January 20, 2011, Dr. Gedney responded: "There is no rush to consider treatment. I would not treat until all your problems resolved and treatment recommendations would initiate from ESP." (*Id*.)

In support of her motion for summary judgment, Dr. Gedney has submitted her own declaration. (Doc. # 89-1 at 23-25.) Dr. Gedney is a Senior Physician with NDOC's Regional Medical Facility located at Northern Nevada Correctional Center (NNCC). (*Id*. at 23 ¶ 2.) She is a member of the hepatitis C Committee as well as the Utilization Review Committee, and as such she reviews medical records of inmates who are being submitted to receive medical treatment, including drug therapy for hepatitis C. (*Id*. at 24 ¶ 3.)

According to Dr. Gedney, hepatitis C is a viral infection which primarily affects the liver and while the infection is often asymptomatic, a chronic infection can lead to damage of the liver. (Doc. # 89-1 at 24 ¶ 4.) Drug therapy can be provided to persons infected with hepatitis C, however some genotypes of the virus are more resistant to drug therapy than others, and the drug

therapy in and of itself poses significant risks, including death. (*Id*. ¶ 9.) As a result, drug therapy is not prescribed and administered without "extensive evaluation of the progression of an individual's infection, the individual's psychological and mental state, and the overall general health of the individual." (*Id*.)

Dr. Gedney admits that she responded to Plaintiff's kite on January 20, 2011, and in preparing her response she reviewed his medical records, including his lab results, and formed the opinion that he should not receive drug therapy treatment, which she reflected in her response when she told him there was no rush to consider treatment. (*Id*. at 25 ¶ 11.) Additionally, she asserts that she was not Plaintiff's primary provider at the time, and informed him treatment recommendations would come from his medical providers at ESP. (*Id*.)

She indicates that she reviewed Plaintiff's medical records again in late 2011, when he was submitted to the hepatitis C committee. (*Id*. ¶ 12.) At that time, she states that his medical testing and objective indicators did not support a recommendation of drug therapy for his condition. (*Id*.) She states this decision was further supported by the finding that his particular genotype was 1a which is more resistant to drug therapy than other genotypes. (*Id*.)

Her ultimate opinion is that in 2011, Plaintiff was not an appropriate candidate for drug therapy for hepatitis C and the decision to delay treatment and continue to monitor his condition was medically acceptable and medically advisable. (*Id*. ¶ 13.)

Plaintiff has been referred to the committee again for evaluation of whether drug therapy is appropriate, and that evaluation is currently under consideration. (*Id*. ¶ 14.)[3]

---

[3]  As of the date of the submission of memoranda pertaining to Defendants' motion, the court has not been advised of the committee's determination. Even if the committee had denied Plaintiff treatment it would not impact the court's analysis as Plaintiff has not alleged a claim against the committee members in this regard.

Plaintiff's claim against Dr. Gedney essentially demonstrates a difference of opinion as he is challenging her decision in 2011 to continue to monitor his condition and delay any treatment as compared to his desire for drug therapy or some other form of treatment. There is no evidence, however, that this decision was medically unacceptable under the circumstances and was chosen in conscious disregard of an excessive risk to Plaintiff's health.

Moreover, Plaintiff's assertion in his opposition that Dr. Gedney denied him treatment for his condition because he was violent appears to be unfounded and based on nothing more than Plaintiff's mere speculation. Plaintiff even provides Dr. Gedney's responses to his interrogatories where he asked Dr. Gedney if she informed another prison that Plaintiff was not receiving hepatitis treatment because she thinks he is violent and she responded in the negative. (Doc. # 96-1 at 6.)

Plaintiff also argues that Dr. Gedney inappropriately bases her denial of treatment in January of 2011 on the fact that Plaintiff's hepatitis C genotype was 1a when his genotype was not even identified until December 2011. (Doc. # 96 at 3.) Dr. Gedney did not base her response to Plaintiff's January 2011 kite on Plaintiff's genotype. Instead, she states that *later in 2011* it was determined that his genotype was 1a, which further supports the decision to delay drug therapy treatment. (Doc. # 89-1 at 25 ¶ 12.)

In sum, the court cannot conclude Dr. Gedney was deliberately indifferent to Plaintiff's medical condition, and as such recommends that summary judgment be granted in her favor.

**2. Nurse Snider**

Plaintiff's claim against defendant Snider is centered on her response to a grievance where Plaintiff requested treatment for his condition and she responded that his liver enzymes were within normal limits and denied him any medical care. (Doc. # 4 at 5.)

11

In the informal level grievance, which is set forth as an exhibit to Defendants' motion, Plaintiff requests medical attention for his hepatitis C. (Doc. # 89-1 at 20-21.) The response states: "Your liver enzymes are within normal limits. We will continue to monitor you. Grievance Denied." (*Id*. at 19.)

In support of the motion for summary judgment, defendant Snider has submitted her own declaration. (Doc. # 89-1 at 32-33.) Defendant Snider is a registered nurse, and at all relevant times was employed by NDOC as Director of Nursing Services I at NNCC. (*Id*. at 32 ¶ 2.) As part of her duties, she was responsible for responding to informal grievances relating to medical issues. (*Id*. ¶ 3.) She admits she prepared a response to Plaintiff's informal level grievance (grievance number 20062918147). (*Id*. at 33 ¶ 4.) In preparing her response, she asserts that she reviewed his medical records, including his lab results. (*Id*.) She told Plaintiff at the time his liver enzymes were within normal limits and that NDOC medical staff would continue to monitor his health and the progression of his disease. (*Id*. ¶ 5.)

Plaintiff argues that in fact his liver enzyme levels were elevated, and so defendant Snider was deliberately indifferent when she stated otherwise and denied his informal level grievance. To support this argument, Plaintiff submits defendant Snider's responses to requests for admissions he propounded. Plaintiff first asked defendant Snider to admit that attachment A to his requests is a copy of a medical kite showing Plaintiff's liver enzyme levels. (Doc. # 96-1 at 105, Request for Admission No. 5.) Subject to various objections, she responds that the laboratory results written on the kite attached by Plaintiff are consistent with laboratory testing results for Plaintiff dated **September 29, 2011**. (*Id*., response to Request for Admission No. 5.)

Plaintiff then asks defendant Snider to admit that her response to Plaintiff's grievance stating that his liver enzyme levels were within normal levels was a lie. (*Id*., Request for

12

Admission No. 6.) Subject to various objections, defendant Snider's response is a denial and she states that she responded to Plaintiff's grievance on **April 13, 2011**, and laboratory testing performed on Plaintiff on **February 25, 2011 and October 7, 2010** indicated that his liver enzymes (referred to medically as AST [SGOT] and ALT [SGPT])[4] were within normal limits, while the document attached to Plaintiff's requests contains results from **September 29, 2011**, five months *after* she wrote her grievance response.

Thus, at the time defendant Snider wrote her response to Plaintiff's informal level grievance, she was correct that his liver enzyme levels were within normal limits. As such, there is no evidence this response was in conscious disregard to an excessive risk to Plaintiff's health. Accordingly, summary judgment should be granted in defendant Snider's favor.

**3. Nurse Peery**

Plaintiff's claim against defendant Peery is based on his response to Plaintiff's first level grievance regarding the lack of treatment for his condition. (Doc. # 4 at 5.)

Nurse Peery's first level grievance response states:

Mr. O'Neill,
Like most medications, the treatment for Hepatitis C is not without risk. In the event that disease such as yours is not active enough to cause liver enzyme rise, indicating more active disease, physicians will not elect to treat [you] because the disease is not curable. If you had an active or fulminate disease state, as indicated by an elevation of these enzymes, then I'm sure the physicians would consider you for treatment. In consideration of treatment, you would have to have your particular Hepatitis genotyped to see if you were even a candidate for therapy (some genotypes do not respond to therapy). Even when someone has the proper genotype for treatment, if they do not respond with a certain huge decrease in virus count, the therapy is stopped because of the potential of more harm than good, or simply not good enough reaction to warrant the risk. The answer you got in the informal grievance was therefore accurate, just not as detailed as this one, and I hope this answer will allow you to understand why your grievance is denied.

---

[4]  The medical records as well as Dr. Bannister's responses to Plaintiff's discovery indicate that generally a normal score for the AST liver enzyme is between zero and forty and a normal score for the ALT liver enzyme is between zero and fifty-five. (*See, e.g.,* Doc. # 96-1 at 32, 45-46.)

(Doc. # 89-1 at 17.)

In support of the motion for summary judgment, defendant Peery has submitted his own declaration. (Doc. # 89-1 at 35-36.) During the relevant time period, defendant Peery was employed by NDOC as Director of Nursing Services II at NNCC, and was responsible for responding to first level grievances regarding medical issues. (*Id*. at 35 ¶¶ 2-3.) He admits to responding to Plaintiff's first level grievance (grievance number 20062918147) after reviewing Plaintiff's medical records, including his lab results. (*Id*. at 36 ¶ 4.) In his response, he explained that medical treatment for hepatitis C is not without risks and that the progression of his disease at the time was not active enough to warrant drug therapy treatment. (*Id*. ¶ 5.) In addition, he explained that the evaluation of whether to utilize drug therapy depends in large part on the particular genotype because certain genotypes do not respond to drug therapy. (*Id*.)

The sole basis for Plaintiff's deliberate indifference claim against defendant Peery. Is this grievance response where Defendant Peery provided Plaintiff with a fairly detailed explanation for the perceived lack of treatment he was receiving for his hepatitis C. He told Plaintiff that his liver enzymes were not elevated so as to indicate a progression of the disease, and even if they were, drug therapy has its own risks. He went on to explain that in addition certain genotypes do not respond well to drug treatment. The court simply cannot conclude that this response evidences deliberate indifference to Plaintiff's condition; therefore, summary judgment should be granted in defendant Peery's favor.

**4. Dr. Bannister**

Plaintiff's claim against Dr. Bannister centers on Dr. Bannister's response to Plaintiff's second level grievance concerning a lack of treatment for his condition. (Doc. # 4 at 5.)

14

1

2          Plaintiff's second level grievance states that his enzyme levels have been above the

3    highest limit, that his symptoms have increased, and that NDOC has not checked his genotype to

4    find out if he is a candidate for drug therapy. (Doc. # 89-1 at 15.) He states that he wants a more

5    in depth review of possible treatment. (*Id*. at 16.) Dr. Bannister's response to the second level

6    grievance states: "Agree with the response provided at the first level. Please continue to follow

7    up with Medical at ESP." (*Id*. at 14.)

8          Dr. Bannister has likewise submitted his own declaration in support of the motion for

9    summary judgment. (Doc. # 89-1 at 38-40.) Dr. Bannister was formerly employed as NDOC's

10   Medical Director, and was responsible for responding to second level grievances related to

11   medical issues. (*Id*. at 38 ¶¶ 2-4.) He admits that he responded to Plaintiff's second level

12   grievance (grievance number 20062918147) after reviewing Plaintiff's medical records. (*Id*. at 39

13   ¶ 5.) He also reviewed defendant Snider's and defendant Peery's responses to Plaintiff's informal

14   and first level grievances. (*Id*. ¶ 6.) He informed Plaintiff that he agreed with the response given

15   by defendant Peery to Plaintiff's first level grievance. (*Id*. ¶ 7.) He further instructed Plaintiff to

16   follow up with his medical care providers at ESP. (*Id*.)

17          This second level grievance response is the only basis for Plaintiff's deliberate

18   indifference claim against Dr. Bannister. Dr. Bannister states that he reviewed Plaintiff's medical

19   records as well as the lower level grievance responses of defendants Snider and Peery, in

20   preparing this response. As noted above, Defendant Peery's first level grievance response

21   explained, in some detail, why Plaintiff was not receiving further treatment for his condition.  In

22   addition, Dr. Bannister told Plaintiff that he should continue to follow up with his medical

23   providers at ESP. As the court concluded with respect to defendants Snider and Peery, this

24

25

26

27

28

second level grievance response does not evidence the knowing disregard of an excessive risk to Plaintiff's health. Accordingly, summary judgment should be granted in Dr. Bannister's favor.

**5. Dr. Koehn**

With respect to Dr. Koehn, Plaintiff alleges that on November 22, 2011, he was seen by Dr. Koehn, who stated that Plaintiff's liver was swollen as a result of his hepatitis C, but told Plaintiff he does not treat hepatitis C and Plaintiff would just have to "tough it out." (Doc. # 4 at 6.)

Dr. Koehn also submits his declaration in support of the motion for summary judgment. (Doc. # 89-1 at 27-30.) Dr. Koehn is a physician at ESP. (*Id*. at 27 ¶ 2.) He relays that in August 2010, Plaintiff had surgery to repair an inguinal hernia, and after the surgery Plaintiff expressed multiple complaints of pain, including that the pain extended into his abdomen. (*Id*. at 28 ¶ 8.) In 2011, Plaintiff began expressing complaints of back pain and other generalized complaints of pain in his abdomen and legs. (*Id*. ¶ 9.) He states that during this time, he and the medical providers at NNCC, attempted to identify the cause of Plaintiff's pain and provide appropriate pain management. (*Id*.)

He acknowledges that he conducted an examination of Plaintiff on November 22, 2011. (*Id*. at 28-29 ¶ 10.) During the examination, Plaintiff expressed complaints of back and abdominal pain. (*Id*.) Based on the examination, Dr. Koehn noted that Plaintiff may have "mild inflammation of the hepatic capsule" which "may or may not be related to his infection with Hepatitis C." (*Id*.) As a result of this examination, he referred Plaintiff to see Dr. Mar for consideration for a referral to a pain management specialist, ordered the refill of his medications and ordered that his hepatitis C genotype be identified. (*Id*.) Plaintiff's genotype was identified as

16

genotype 1a. (*Id.*) Following this examination, Dr. Koehn monitored Plaintiff's medical condition while he was housed at ESP. (*Id.*)

Dr. Koehn claims that on the many occasions he has seen Plaintiff since 2011, he has explained to Plaintiff the implications of his genotype and drug therapy treatment, discussed and explained his lab results and what they indicate with respect to the progression of his disease as well as whether drug therapy would potentially be appropriate. (*Id.* ¶ 12.)

As a general practitioner at ESP, Dr. Koehn cannot order drug therapy for hepatitis C but can refer patients to the hepatitis C committee and Utilization Review Panel for consideration for drug therapy treatment. (*Id.* ¶ 13.) In December 2011, Dr. Koehn did direct that Plaintiff be referred to the hepatitis C committee for consideration for drug therapy treatment, but he was denied treatment at that time, although he was to be reconsidered in a year. (*Id.* ¶¶ 14-15.) Since that time, Dr. Koehn indicates that Plaintiff has received several blood tests to continually monitor the progression of his disease. (*Id.* ¶ 15.)

On April 9, 2013, Dr. Koehn ordered Plaintiff admitted to the ESP infirmary for observation for possible blood in his stool and evaluation of his abdominal pain. (*Id.* ¶ 16.) Part of the medical testing ordered in April 2013 was to determine whether Plaintiff's hepatitis C infection was progressing to a stage where it would be appropriate for treatment, to determine whether there were objective indications of damage to his liver, and to identify whether there were indications of the development of cancer to the liver. (*Id.* at 30 ¶ 17.) All medical testing came back with results not indicating significant progression of his hepatitis C. (*Id.*)

As a precaution, Dr. Koehn ordered an abdominal ultrasound in May of 2013, to provide a diagnostic tool to evaluate Plaintiff's liver and abdominal organs in an attempt to diagnose his complaints of pain to his abdomen. (*Id.* ¶ 18.)

He has nonetheless referred Plaintiff to the hepatitis C committee again for consideration for drug therapy treatment. (*Id.* ¶ 20.) His medical records indicate that the labs were sent to the hepatitis C committee on January 3, 2012 and March 7, 2013. (Doc. # 91-1 at 26.)

Plaintiff, on the other hand, argues that Dr. Koehn has failed to provide him with adequate treatment to address his condition.

Even taking as true Plaintiff's allegation that Dr. Koehn told him to "tough it out" after the November 22, 2011 examination, Dr. Koehn's conduct subsequent to this examination does not evidence deliberate indifference to Plaintiff's condition. In fact, Plaintiff was seen multiple times for complaints of pain, and notes indicate that discussions were had regarding Plaintiff's condition and genotype. (Doc. # 91-1 at 34-35.) Dr. Koehn referred Plaintiff to the hepatitis C committee (*id.* at 36), and it was explained to Plaintiff that treatment was deferred by the committee for a year due to "lack of concerning labs." (*Id.* at 34; *see also* Doc. # 96-2 at 9.) The decision not to enroll Plaintiff in treatment was made by the hepatitis C Committee and not Dr. Koehn. (*Id.*)

Following the deferral of treatment by the hepatitis C committee, Plaintiff continued to be examined and evaluated for complaints of pain to his abdomen. (Doc. # 91-1 at 28, 44-49; Doc. # 96-2 at 10, 11.)

In early January 2013, Plaintiff's lab results showed that his liver enzyme results were elevated. (*See* Doc. # 96-2 at 14 (AST level of 7, ALT level of 102).) When Plaintiff complained of pain, he was examined several times, admitted to the infirmary, and was referred again to the hepatitis C committee. (*See* Doc. # 96-2 at 15-18, 21-36.) At the time of the filing of the motion, the referral was still under consideration by the committee.

The court cannot conclude that Dr. Koehn's conduct amounts to deliberate indifference. Plaintiff has received ongoing care from Dr. Koehn and the staff at ESP. Dr. Koehn has examined and evaluated Plaintiff when he complains of pain, has admitted him to the infirmary when necessary, ordered an ultrasound of his abdomen to try to determine the source of his abdominal pain, and has referred Plaintiff again to the hepatitis C committee which will determine whether he will receive further treatment in the form of drug therapy for his condition. Whether he ultimately receives this treatment is not Dr. Koehn's decision. As such, Plaintiff's claim against Dr. Koehn amounts to a difference of opinion and he has not presented evidence that Dr. Koehn's course of conduct was medically unacceptable under the circumstances or in conscious disregard of an excessive risk to Plaintiff's health. Therefore, summary judgment should be granted in Dr. Koehn's favor.

Because the court has recommended granting summary judgment in favor of all defendants as to all remaining claims, it need not reach the official capacity damages or qualified immunity arguments advanced by the defense.

### IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an order **GRANTING** Defendants' motion for summary judgment (Doc. # 89).

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule IB 3-2 of the Local Rules of Practice, specific written objections to this Report and Recommendation within fourteen (14) days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of the District Court's judgment.

**DATED:  January 6, 2014.**

_____
**WILLIAM G. COBB**
**UNITED STATES MAGISTRATE JUDGE**